# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SREYNUON LUNN,**<br><br>Petitioner,<br><br>v.<br><br>**YOLANDA SMITH,** Superintendent of Suffolk County House of Correction, *et al.*,<br><br>Respondents | Civil Action No. 17-cv-10938-IT |

## DECLARATION OF PHILIP T. MILLER

I, Philip T. Miller, do hereby declare and say:

1. Since July 27, 2015, I have been employed by U.S. Immigration and Customs Enforcement (ICE) as the Deputy Executive Associate Director, Office of Enforcement and Removal Operations (ERO), in Washington, D.C. In this position, I assist the Executive Associate Director in leading ERO, including overseeing programs and operations to identify and apprehend removable aliens, to detain these individuals when necessary, and to remove illegal aliens from the United States. ERO has approximately 7,600 employees and is comprised of six headquarters divisions and 24 Field Offices.

2. I began my career with the U.S. Immigration and Naturalization Service, (INS) (ICE's predecessor) in August 1996 as an immigration inspector at the New Orleans Port of Entry. In 1998, I became an INS deportation officer in New Orleans and then an INS special agent in 2001. With the creation of ICE in 2003, I became a special agent with ICE's Office of Investigations. In 2007, I became an Assistant Field Office Director for ERO in New Orleans.

1

In 2008, I became the Deputy Field Office Director in New Orleans, then the Field Office Director in September 2009. Before assuming my current position, I became the Assistant Director for Field Operations for ERO in Washington, D.C. in May 2013.

3. The matters contained in this declaration are based upon my review of the information withheld in the case of *Lunn v. Yolanda Smith, Superintendent of Suffolk County House of Correction, et al.*, 17-cv-11938, in the U.S. District Court for the District of Massachusetts, and after consideration of information available to me in my capacity as Deputy Executive Associate Director.

4. I am aware that in the course of the litigation Petitioner has submitted "Petitioner Sreynuon Lunn's First Set of Interrogatories" requesting information which includes the basis for the ICE detentions of the Petitioner, along with policies and procedures relating to those detentions.

5. I am also aware that Respondents in responding to the request for interrogatories have withheld information on the ground that the information sought was protected from disclosure by the law enforcement privilege. The withholdings are limited and narrowly tailored to only that information that is privileged.

6. I am aware that in this present litigation the parties have entered into a Protective Order, ECF No. 52, and I have reviewed the terms of this Protective Order. For the reasons mentioned in the below paragraphs, public disclosure of the information withheld would compromise the integrity of ICE's enforcement techniques and procedures. Because the information sought applies to the relationship with a foreign government and relates to the removal of aliens from the United States to Cambodia, even disclosure under a protective order would not mitigate the risks because the withheld privileged information would be provided to third parties outside the federal government.

7. I have recently reviewed the information withheld and submit this declaration as the formal

assertion invoking the law enforcement privilege for the information withheld.

8. Beginning in 2002, the United States has repatriated Cambodian nationals with final orders of removal in accordance with an agreement with the Cambodian government. Pursuant to the repatriation agreement between the United States and Cambodia, Cambodian government officials periodically come to the United States and conduct in-person interviews to verify nationality of Cambodians with final removal orders. Not all Cambodian nationals with final orders of removal are presented to Cambodian government officials for interviews. Instead, ICE annually selects between 50 and 100 Cambodian nationals with final orders of removal who have strong evidence of Cambodian nationality and are within the scope of the agreement between the two countries.

9. In addition to strong evidence of Cambodian nationality, a variety of other factors, in ICE's experience, affect the likelihood of removability to Cambodia.

10. If information about these standards and how they apply is made publicly available, aliens could take steps to attempt to make themselves non-compliant, so to speak, with the standards. If they are successful in their non-compliance efforts, the adverse results could include either that ICE (a) cannot determine which aliens with final orders of removal are in fact likely to be removed within a reasonable time and which ones are not and therefore does not present them for interviews; or, (b) presents them for interviews but the Cambodian government does not issue travel documents for those aliens. In either circumstance, ICE's efforts to remove these aliens with final orders of removal -- including those who have criminal records or otherwise are threats to public safety -- will be thwarted and they will remain in the United States in violation of the immigration laws.

11. In Interrogatory number 6, the Petitioner asks whether Respondents have "experience" with six factors "influenc[ing] the likelihood of removal to Cambodia." Without acknowledging that

Respondents have experience with those factors sufficient to say that any of those factors influence the likelihood of removal to Cambodia, aliens who are aware of those factors and of Respondents' experiences with those factors could provide inaccurate information with respect thereto:

    a. Criminal history: Omit or misrepresent criminal history.

    b. Birth outside of Cambodia: Present an altered or fabricated birth certificate.

    c. Length of residence in the United States: Misrepresent the amount of time one has lived in the United States.

    d. Lack of prior residences in Cambodia: Misrepresent whether one previously lived in Cambodia, and if so, for how long.

    e. Lack of family members in Cambodia: Misrepresent the existence, or not, of family members in Cambodia.

    f. Mental and physical health: Misrepresent the status of one's health.

12. In Interrogatory number 7, Petitioner requests whether the Government of Cambodia has communicated "preferred or disfavored" characteristics of Cambodian nationals who are to be repatriated. If this information is disclosed to the public, aliens could, as discussed in the previous paragraph, misrepresent their actual circumstances or characteristics. Again, this could result in ICE being unable to determine which of these aliens with final orders of removal are in fact likely to be removed within a reasonable time and which ones are not, and therefore the agency does not present them for interviews; or, ICE presents them for interviews but the Cambodian government does not issue travel documents. The same adverse effects as stated in the previous paragraph will result.

13. Disclosure could also harm the collaborative relationship between ICE, other federal government agencies, and foreign government counterparts. The information withheld here is

4

essential to the cooperative discussions to effectuate removals to Cambodia. Disclosure of the withheld information could lead to difficulties in engaging with government representatives of Cambodia, and potentially other foreign governments as well, if they believe that this or similar information is subject to disclosure to third parties.

14. Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 29th day of March 2018, in Washington, District of Columbia.

_____
Philip T. Miller
Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Washington, District of Columbia